D. R. HOLLINGSWORTH and ROCKWOOD INSURANCE Company *v.* JIMMY RAY EVANS and MARY LEE EVANS

73-112                                   500 S.W. 2d 382

Opinion delivered October 29, 1973

*Shackleford & Shackleford,* by: *Norwood Phillips,* for appellants.

*Paul K. Roberts,* for appellees.

J. Fred Jones, Justice. This is an appeal by D. R. Hollingsworth and Rockwood Insurance Company, the employer and compensation insurance carrier respectively, from a circuit court judgment reversing the Arkansas Women's Compensation Commission's dismissal of claims filed by Jimmy Ray Evans and Mary Lee Evans against Hollingsworth. The appellants contend on this appeal that the decision of the Workmen's Compensation Commission is supported by substantial evidence and the circuit court erred in reversing the Commission.

The facts appear as follows: Hollingsworth had a contract with the Georgia Pacific Corporation whereby Hollingsworth purchased pulpwood in Bradley County and shipped it to Georgia Pacific. When the contract was entered into, Hollingsworth was required to submit proof to Georgia Pacific that Hollingsworth had procured a policy of workmen's compensation insurance. Before Georgia Pacific would pay Hollingsworth for the pulpwood he shipped, Hollingsworth was required to attach to each 'bill of lading a statement that he had complied with state law pertaining to workmen's compensation insurance coverage. Hollingsworth carried workmen's compensation insurance under a policy issued by Rockwood Insurance Company and was charged a premium of 47 cents per cord of pulpwood he shipped to Georgia Pacific. Mr. Hollingsworth maintained a pulpwood yard in Warren, Arkansas, where pulpwood was delivered by truck and loaded onto railroad cars for shipment to Georgia Pacific.

Hollingsworth purchased pulpwood from various individuals including Jimmy Ray Evans. Mr. Evans owned a pulpwood truck and was engaged in the business of purchasing timber, cutting it into pulpwood and selling it to Mr. Hollingsworth. At Mr. Evans' request, Hollingsworth withheld from the amount due Evans for pulpwood sold to Hollingsworth, the amounts Evans had agreed to pay the owner of the timber he purchased and Hollingsworth would pay that amount direct to the timber owner and the balance to Evans.

Mr. Evans had purchased some saw log tree tops on land owned by a Miss Hardy and on November 1, 1971, Evans and his wife were cutting the tree tops into pulpwood to be delivered to Hollingsworth when a bolt in their chainsaw broke. Mr. and Mrs. Evans started in their pickup truck to Warren to have the chain saw repaired when they were involved in a collision with another vehicle in route and both of them were injured. They filed a claim for workmen's compensation benefits and following a hearing before a Referee, their claims were denied by the Referee and the Commission.

On appeal to the circuit court, the court found there was no substantial evidence to warrant the Commission in denying the claims. The court found that Hollingsworth was required by Georgia Pacific to provide workmen's compensation insurance for the *workers who produced the pulpwood* Hollingsworth shipped to Georgia Pacific. The court further found that the claimants paid a consideration to Hollingsworth for each cord of wood claimants produced, or had a consideration withheld by Hollingsworth from each cord produced, and for these reasons the claimants were covered by the policy of insurance issued to Hollingsworth by the respondent, Rockwood Insurance Company. The court further found that the respondents were estopped to deny that claimants were covered by the policy because they had already paid similar claims. The court reversed the decision of the Commission and remanded the case with directions to award benefits to Mr. and Mrs. Evans. We must agree with the appellants that the decision of the Workmen's Compensation Commission is supported by substantial evidence and the circuit court erred in reversing the Commission.

Mr. Evans testified that he had been cutting and hauling pulpwood to Hollingsworth for about four years with the exception of perhaps one week when he hauled his pulpwood to another buyer. He said that he was receiving $15 per cord for pine and $12 per cord for oak for the pulpwood delivered to Hollingsworth's yard. He said he purchased his timber from various individuals and at the time of his and his wife's injuries, he was hauling from downed tree top timber he had purchased from Miss Hardy. He said Miss Hardy's woods foreman directed him to the tract from which he was to cut and that by mutual agreement, Mr. Hollingsworth paid directly to the Hardy interest the amount per cord he agreed to pay for the timber tops he was cutting, and that Hollingsworth paid the balance directly to him. He was asked and answered the following questions:

"Q. Was anything taken out of your wages or the money that you got for insurance?

A. I really don't know how that insurance is set up.

Q. You don't know how that is set up?

A. It is so much a cord. I don't know whether that is held out of our check or just how that works. I really don't know."

Mr. Evans testified that he carried no insurance of his own and at one time, prior to his injury, he had a conversation with Hollingsworth concerning insurance. When asked about the conversation, he testified in part as follows:

"A. Well, it was brought up a time or two, but I never did question it. Donnie just said that we were covered out there in the woods if we got hurt or anything, that we had the insurance.

Q. When did Mr. Hollingsworth tell you that?

A. I don't remember exactly. It's been—well I believe that was before I even went to hauling to him. I'm not sure."

Mr. Evans said Hollingsworth's statement concerning insurance was made when he, Evans, was in partners with his uncle. He said he had a helper about that time who was injured and his claim was accepted by Hollingsworth's compensation carrier. He said he is quite sure he was hauling for Hollingsworth at that time. He then said:

"I don't remember the date. I do remember we was talking about that insurance. I remember this much about it, it was ever who we hauled the last wood to, if we had an accident before we got in with the next load, the one that we hauled the last load to, whether I hauled it to Martindale or down to Hermitage, their insurance was the one obligated to pay it. I do remember hearing—I do remember that about the insurance."

Mr. Evans testified that he had no employees except himself and his wife when he was injured; that he owned his own equipment including his pulpwood truck, loader and saws; that he purchased his own timber and furnished his own fuel. He said that Hollingsworth did not direct any of his activities in connection with the pulpwood cutting and hauling except that he designated the length of pulpwood acceptable. He said that he carried on his operation without any interference or assistance from Hollingsworth and that he worked when he wanted to. On cross-examination he testified that cost of stumpage was forwarded directly to the owner of the stumpage and that he received the amount left over for the pulpwood he delivered to Hollingsworth.

"Q. So there was nothing withheld out of your check except the amount of the cost of the stumpage?

A. To the best of my knowing, that's all."

On redirect examination Mr. Evans testified that after he dissolved the partnership with his uncle, he continued to haul pulpwood to Hollingsworth, but that nothing else was ever said about insurance until after his accident and injury. He said that after the injuries he and his wife sustained, he asked Mr. Hollingsworth about insurance coverage.

". . . [M]e and Donnie were just talking, and I asked him about did he think that I ought to be covered or was I covered, and he said, 'Well, I can't tell you that you are and I can't tell you that you ain't, but my opinion you should be covered. . . .'"

Lawrence H. Derby, Jr., the insurance agent from whom Hollingsworth obtained the policy issued by Rockwood, testified that he did not recall Rockwood paying a claim on a man named E. L. Davis. At this point the appellant's attorney, after conferring with Hollingsworth, volunteered the information that there was a "medical only" claim filed for $4 or $5 which was paid. The insurance policy issued to Hollingsworth was a standard workmen's compensation insurance policy agreeing "to pay, promptly when due, all compensation and other benefits required of the insured by the workmen's compensation law."

Mr. Hollingsworth testified that he had workmen's compensation insurance coverage at the time Mr. and Mrs. Evans were injured, and that he was paying 47 cents per cord in premiums for the insurance and that the premium was paid on the basis of check stubs he received from Georgia Pacific for the pulpwood he shipped to them. He said he would take, or mail, his check stubs to his agent Derby, and that Derby would then mail back to him a premium statement based on the total number of cords of pulpwood he had shipped to Georgia Pacific during the month. He said he shipped all his pulpwood to Georgia Pacific and that his insurance premium would vary with the number of cords of pulpwood he shipped. He said when he purchased the insurance, agent Derby told him his subcontractors would be covered under the policy, but that he did not withhold anything for insurance premiums from the amounts due the haulers. He testified that he had no "direct" employees. He said that he had no employees from whom he was withholding Social Security or income tax, and that he turned in no quarterly reports pertaining to same.

Mr. Hollingsworth was not asked to explain his meaning of *direct* employees as distinguished from em-

ployees that were not direct. In attempting to explain the insurance coverage he purchased from Derby, he testified as follows:

> "Mr. Derby and I talked about this when I began business. My father had this business prior to the time that I took it from him. At the time he was paying an extra ten cents a cord to cover a sub-contractor. At the time I took the policy, I had only sub-contractors and I felt like it would be only reasonable that I should pay only the ten cents a cord and not the basic policy fee. At that time we discussed it. It's been many years ago and I could not say, word for word, what was said at that time. I don't think Mr. Derby could. There was no written agreement but the only reason I had the policy was to protect me against liability and to protect my employees as such, as sub-contractors."

Mr. Hollingsworth then testified that he entered into his contract with Georgia Pacific about 1968 and Georgia Pacific required him to furnish proof that he had workmen's compensation insurance coverage. He said:

> "I bought it because it was required by law and because I had to have protection for myself at the time I bought it. I was under the impression that my sub-contractors were covered. That's the best answer I can give you on it. . . . "

Mr. Hollingsworth said he had been selling wood to Georgia Pacific and buying it from people such as Mr. Evans and others similarily situated for approximately three years. He said he usually had between three and ten different haulers who delivered pulpwood to him on the same basis as Mr. Evans; that "they come and go." He said the contract between him and Georgia Pacific was subject to cancellation at any time by either party notifying the other; that he was required to attach to the bill of lading on each car of pulpwood he shipped to Georgia Pacific a form saying he had complied with all laws and statutes of Arkansas, but that he was not required to present a receipt showing he had purchased

workmen's compensation insurance except the one time when he entered into the original contract with Georgia Pacific.

Ark. Stat. Ann. § 81-1306 (Repl. 1960) provides that when a subcontractor fails to secure compensation required by the Act, the prime contractor shall be liable for compensation of the employees of the subcontractor. Mr. Hollingsworth refers repeatedly to his obtaining insurance for the protection of his "subcontractors." The *prime* contract is not in evidence and there is no evidence one way or the other relating to the duties of subcontractors as distinguished from haulers or producers such as Mr. Evans, from whom Mr. Hollingsworth purchased pulpwood. It is entirely possible that Mr. Hollingsworth considers the haulers, such as Mr. Evans, as "subcontractors." He said, however, that when he took the business over from his father, that his father had *one* subcontractor. Mr. Hollingsworth did say he had no "direct employees" but he did not say who loads the pulpwood from his woodyard to the railroad cars, and he did not say whether anyone else is involved in his operation except himself and the haulers from whom he purchases pulpwood delivered to his yard.

There is, of course, a considerable difference between a subcontractor and an independent contractor. In Black's Law Dictionary, Rev. 4th Ed., a subcontractor is defined as:

"One who takes portion of a contract from principal contractor or another subcontractor. * * * One who has entered into a contract, express or implied, for the performance of an act with the person who has already contracted for its performance."

In *Gaydos* v. *Packanack Woods Dev. Co.,* 166 A. 2d 181, at page 184, the New Jersey Court defines a subcontractor in a workmen's compensation case as follows:

"A subcontractor is one who enters into a contract with a person for the performance of work which such person has already contracted to perform. In other

words, subcontracting is merely 'farming out' to others all or part of work contracted to be performed by the original contractor."

. As already stated, the prime contract between Hollingsworth and Georgia Pacific is not before us so it is entirely possible that in addition to purchasing pulpwood from haulers or producers such as Mr. Evans, Hollingsworth did have subcontractors performing part or all of his contract with Georgia Pacific and these employees, as well as Georgia Pacific, would have been protected as a matter of law by Hollingsworth's compensation coverage.

The employees of a subcontractor are covered by workmen's compensation benefits under the prime contractor's coverage in the event the subcontractor does not have separate coverage for his employees, but the employees of an independent contractor who is not a subcontractor are not covered as are the employees of a subcontractor under § 81-1306., This statute does not provide coverage, as a matter of law, for the subcontractor himself but only applies to his employees. The record is not clear whether Mr. Hollingsworth himself was a subcontractor under Georgia Pacific or was simply an independent contractor who purchased and sold pulpwood to Georgia Pacific. It is apparent, however, from Mr. Hollingsworth's testimony, he believed he was required to carry a workmen's compensation policy by the laws of Arkansas, but there is no evidence in the record that he was so required.

The trial court apparently based its decision on such cases as *Stillman* v. *Jim Walter Corp.*, 236 Ark. 808, 368 S.W. 2d 270, and *Hale* v. *Mansfield Lbr. Co.*, 237 Ark. 854, 376 S.W. 2d 670. In the *Stillman* case the contract between the parties was in evidence in which Jim Walter was designated "contractor" and Roy Stillman was designated as "subcontractor." The Jim Walter Corporation engaged Stillman to build houses for a specified consideration depending upon the type of house constructed. Stillman was to furnish only the labor. The contract in that case provided that the subcontractor was to furnish the contractor with a certificate of workmen's compensa-

tion coverage on *subcontractors and on employees* of the subcontractor. In the absence of such certificate, all payments due the subcontractor were subject to a three per cent deduction and the contractor would furnish such workmen's compensation coverage. Stillman was injured on the job and filed a claim for compensation benefits. The claim was defended on the ground that Stillman was an independent contractor and not an employee. In that case we pointed out that the Jim Walter Corporation had agreed, for a consideration of three per cent of the contract price payable to Stillman, to furnish workmen's compensation coverage *for Stillman as well as his employees.* With Stillman's consent the three per cent was deducted and the coverage furnished. In that case we held that regardless of whether Stillman was in fact, an independent contractor or employee, under the facts in that case, the Jim Walter Corporation was estopped to say that Stillman was not entitled to workmen's comepnsation. The decision in that case turned on the written contract supported by valuable consideration. Such is not the fact supported by any substantial evidence in the case at bar.

In *Hale* v. *Mansfield Lbr. Co., supra,* Hale was to receive $7.50 per 1,000 board feet *plus payment of the insurance premum* for skidding logs out of the woods and loading them on trucks. Hale owned and used his own team in the operation and no other insurance premiums were involved except workmen's compensation insurance premiums. The primary distinction in *Hale* and the case at bar, however, was that Mansfield Lumber Company was removing timber from government land under a contract with the government, and in that case we said:

"Even if it can be said that Hale was an independent contractor, he was an independent subcontractor, and Mansfield would be liable to his employees under the workmen's compensation law."

Hale had no employees of his own and was simply one of the workmen getting out the timber in the performance of Mansfield's contract with the government. Mansfield paid a premium for workmen's compensation insurance in the amount of $11.36 on every $100 of remuneration

paid to Hale and we held that it could be fairly inferred that the insurance was to cover Hale as well as the other workers. The insurance policy in that case specifically covered logging and that was what Hale was doing. Had Hale been the one who entered into a contract with the government for the purchase and removal of timber from government land, and if he in turn had cut the timber and sold the logs to the Mansfield Lumber Company, the *Hale* case would have been more in point with the case at bar and also in point with the cases of *West* v. *Lake Lawrence Pulpwood Co.,* 233 Ark. 629, 346 S.W. 2d 460, and *Pearson* v. *Lake Lawrence Pulpwood Co.,* 247 Ark. 776, 447 S.W. 2d 661.

The facts in *West, supra,* as set out on page 631 of the Arkansas Report are almost identical to the facts set out in the case at bar and in *West* this court on appeal, sustained the Commission in denying compensation. As pointed out in the dissenting opinion in *West,* both West and Lake Lawrence thought West was covered by Lake Lawrence's workmen's compensation policy and Lake Lawrence deducted a fixed sum per cord of wood cut for workmen's compensation insurance. The dissenting members of the court in *West* would have applied the rule of estoppel but the majority of the court did not agree.

In the *Pearson* case, *supra,* the facts were very similar to those in the case at bar and we there held there was substantial evidence to support the Commission's denial of compensation on the basis that the decedent was not an employee of the appellee pulpwood company. We wound up our decision in *Pearson* by quoting from *Herman Wilson Lbr. Co.* v. *Hughes,* 245 Ark. 168, 431 S.W. 2d 487, as follows:

" '* * * The question is not whether the testimony would have supported a finding contrary to the one made, but whether it supports the finding which was made.' "

We found in that case that there was substantial evidence to support the Commission.

We are in sympathy with Mr. Hollingsworth's alleged statement to Evans that he thought Evans *should* be covered by Hollingsworth's compensation insurance policy, but we are forced to the conclusion that he was not.

The judgment of the circuit court is reversed.