**EMPLOYERS INSURANCE
OF WAUSAU, Plaintiff,**

v.

**POLAR EXPRESS, INC. and Equipment
Rental, Inc., Defendants.**

Civ. No. 91–5020.

United States District Court,
W.D. Arkansas,
Fayetteville Division.

Nov. 15, 1991.

T. Scott Clevenger, Mitchell, Williams, Selig & Tucker, Little Rock, Ark., for plaintiff.

James E. Crouch, Cypert, Crouch, Clark & Harwell, Springdale, Ark., for defendants.

## MEMORANDUM OPINION

H. FRANKLIN WATERS, Chief Judge.

This action was filed on February 21, 1991, by Employers Insurance of Wausau (Wausau) against Polar Express, Inc. (Polar). By amended complaint filed on August 26, 1991, Equipment Rental, Inc. was named as an additional defendant. The court has jurisdiction by virtue of diversity of citizenship and the requisite amount in controversy.

The action is currently before the court for decision based on stipulated facts, the briefs of the parties, and accompanying exhibits. The following will constitute the court's findings of fact and conclusions of law as required by Rule 52. Fed.R.Civ.P. 52.

### Findings of Fact

The parties have filed the following agreed joint stipulations of fact:

1. Wausau is a Wisconsin corporation with its principal place of business in Wausau, Wisconsin, and is licensed to do business in the State of Arkansas.

2. Polar is an Arkansas corporation doing business in Arkansas with its principal place of business in Springdale, Washington County, Arkansas.

3. Jurisdiction is conferred upon this court pursuant to 28 U.S.C. § 1332, since the matter in controversy exceeds the sum or value of $50,000, exclusive of interest and costs, and is between citizens of different states.

4. On May 9, 1988, Polar made application for Arkansas workers' compensation insurance coverage pursuant to the assigned risk provisions set forth in Ark.Code Ann. § 11–9–409. The National Council on Compensation Insurance, the national rating organization, assigned coverage to Wausau.

5. On or about May 10, 1988, Wausau issued a policy for workers' compensation insurance to Polar under policy number 1619–00–10857, with a policy period of May 10, 1988, to May 10, 1989. Pursuant to that policy, an estimated premium was calculated using information provided to Wausau by Polar. Polar agreed to permit Wausau to examine and audit all records that related to the policy during regular business hours, during the policy term and within three (3) years after the policy period ended in order to determine the amount of final premium owed for the policy year. The policy provides that all premium for the policy would be determined by Wausau's manual of rules, rates, rating plans and classifications.

6. On July 28, 1989, pursuant to the terms of the policy, Wausau performed an audit on Polar's financial records in order to determine the actual premium due for the policy year.

7. The audit revealed that Polar paid its drivers a taxable gross income and a nontaxable per diem of $.06 per mile for expenses.

8. The audit further revealed that Polar pays its drivers additional sums to load and unload its trucks, or have the drivers hire laborers (lumpers) to perform that task for them.

9. Wausau's auditors included the $.06 per mile per diem as part of the total remuneration paid to drivers in calculating the actual premium due. In addition, Wausau's auditors included the amounts paid to lumpers for loading and unloading their trucks in calculating the actual premium due.

10. Wausau billed Polar for the unpaid premium which it calculated to be $67,626.

11. Polar paid $6,885 and has failed and refused to pay the remaining balance.

Joint Stipulations of Fact.

Equipment Rental, Inc., is a wholly-owned subsidiary of Polar and is an additional insured on the policy. References to Polar made herein shall be deemed to refer to the defendants jointly as their interests are identical.

Drivers for Polar are paid weekly. One check is issued covering the drivers gross pay and their per diem allowance. The paychecks are accompanied by an itemization indicating the amount of wages, taxes, other withholding information, and the amount of per diem. The gross pay is a cents per mile amount that varies between 12 cents and 17 cents per mile depending on the individual driver's experience. The per diem is fixed at six cents per mile for all drivers. Polar regards the per diem allowance as non-taxable income pursuant to the relevant Internal Revenue Service provisions.

The per diem allowance is designed to reimburse drivers for expenses incurred on the road such as meals, lodging and other incidentals. The defendants' trucks are equipped with sleeper cabs. According to Polar, a driver is typically on the road for approximately three weeks at a time. The drivers are not required to itemize their actual expenses. Nor are they required to turn in receipts regarding their expenses.

Initially defendants reimbursed drivers for personal travel expenses on a flat daily allowance. Later the defendants began to reimburse on a cents per mile basis. In reaching the per mile per diem rate the defendants considered the average cost of meals, motel, and other expenses incurred by drivers as well as the number of days spent on the road and the daily mileage average. Additionally, consideration was given to the relevant Internal Revenue Service provisions providing the per diem amount that could be paid as non-taxable income. At some point the amount was raised from $.04 to $.06.

The drivers are also paid additional monies if they have to load and unload their trucks. The drivers are permitted to hire an unloading person known as a "lumper." The lumpers are not under contract with Polar. Generally, lumpers are on call at loading docks and contract for loading or unloading on a per truck basis. Each driver is responsible for loading and unloading his truck and may arrange for a lumper if he wishes. The lumpers are paid in cash by the driver. Some lumpers are employed by unloading service companies. No list is kept of lumpers.

According to Ben Sayle, former controller at Polar, "if any one directs the lumpers it is customary in the industry for a dock supervisor of the shipper or consignee to actual (sic) direct and control the loading and unloading of the trucks." Mr. Sayle further states that "most of the time the lumpers are skilled enough to know how and where to load the freight in the truck and simply work without directions."

Finally, the drivers may receive lay-over pay to compensate the driver for expenses incurred while he is on lay-over and is not carrying a load. As the driver is paid on a cents per mile basis no revenue is being generated when the driver is not driving and accumulating miles. The lay-over pay is not at issue in this case.

On several first report of injury forms submitted to the plaintiff, 18 cents per mile was indicated as the driver's rate. This figure exceeds the 17 cent maximum per mile rate the defendants state is paid to drivers. John Porter in his affidavit states he examined 34 drivers randomly and determined the drivers' rates before per diem is added are as follows:

| Cents per mile | Number |
|:---:|:---:|
| $.13 | 18 |
| $.14 | 6 |
| $.15 | 2 |
| $.16 | 4 |
| $.17 | 4 |

Chuck Crawley, director of safety at Polar, testified that he was in charge of filing the employer's first report of injury with the Arkansas Worker's Compensation Commission and with providing the insurance company with the employee's weekly wage during 1988–1989. Mr. Crawley states he relied on estimates from the payroll department in filling out these forms. During this period of time defendants estimated most drivers' pay at 18 cents per mile. Mr. Crawley indicates he did not check the figures to determine if they were correct. Furthermore, we are told that the average taxable income of the drivers was $350.00 per week, more than enough to receive the maximum amount of disability payments allowed under Arkansas law.

Wausau, during an audit of defendants' books, concluded the per diem allowances and reimbursement for compensation paid to lumpers should be included in calculating the actual premium due. As a result of Wausau's inclusion of these two items, Wausau billed defendants for an additional premium in the amount of $67,626.00. The additional premium charged by Wausau for the lumpers totals $18,194.00 and the total additional premium for the per diem allowance is $42,435.00. Polar objected by letter to the inclusion of the per diem amounts and loading/unloading compensation. After reviewing the audit figures, Polar concluded an additional $6,885.00 was owed. A check in that amount was sent to Wausau. Both the check stub and the back of the check contained the words "Payment in full settlement of Policy # 1619–00–108597 5/10/88—5/10/89."

Remittances on Wausau policies are mailed directly to Wausau's lock box located at Texas Commerce Bank in Dallas, Texas. Texas Commerce Bank has authority to endorse the checks and deposit them directly into Wausau's account. Photocopies of the check faces are sent to Wausau.[1] Further we are informed that Texas Commerce Bank does not deposit checks that have qualified endorsements and that the bank's procedure is to notify Wausau if a remittance has a qualified endorsement so as to afford Wausau an opportunity to ascertain if it acquiesces to depositing the same. As the check in question was cashed, this portion of the procedure was apparently not adhered to.

The National Council on Compensation Insurance is a national rate making organization approved by the State of Arkansas. The National Council produces manuals that are used by carriers in writing workers' compensation insurance. The manuals are used in Arkansas and were used by plaintiff in calculating the additional premium due.

The manual provides the "[p]remium shall be computed on the basis of the total remuneration paid or payable to the insured for services of employees covered by the policy." *Basic Manual for Workers Compensation and Employers Liability Insurance* (1980) by the National Council on Compensation Insurance, p. R–11, Rule V(A) (hereinafter designated as NCCI Manual).

Remuneration is further defined as "money or substitutes for money." NCCI Manual, p. R–11, Rule V(B)(1). Remuneration includes, *inter alia:*

i. The value of lodging, other than an apartment or house, received by employees as part of their pay to the extent shown in the insured's record;

j. The value of meals received by employees as part of their pay to the extent shown in the insured's records.

**1.** Greg Schieffer, regional credit manager for Wausau, in his affidavit states that the check in question did not contain the detachable stub. We agree with the defendants that Mr. Schieffer's statement is hearsay if the procedures he outlines are followed. Mr. Schieffer would not have any personal knowledge concerning what was received by the bank. Rather, Mr. Schieffer merely has a photocopy of the face of the check.

NCCI Manual, p. R–11, Rule V(B)(2)(i., j.). The NCCI Underwriting Guide provides an interpretation section with regard to the premium basis. With regard to employee expense reimbursements and allowances the guide provides:

Reimbursed expenses and flat expense allowances, except for hand or power tools, paid to employees may be excluded from the audit, provided that all three of the following conditions are met:

1. the reimbursed expenses or expenses for which allowances were paid were incurred upon the business of the employer, and

2. the amount of each employee's expense payments or allowances is shown separately in the records of the employer, and

3. the amount of each expense reimbursement or allowances payment approximates the actual expenses incurred by the employee in the conduct of his or her work.

NCCI Underwriting Guide, p. G–39.

The manual makes the following provisions with regard to subcontractors:

### C. SUBCONTRACTORS

1. Law on Contractors and Subcontractors

Most workers compensation laws provide that a contractor is responsible for the payment of compensation benefits to employees of its uninsured subcontractors.

2. Coverage

This statutory responsibility is automatically insured by the Standard Policy issued to the contractor.

3. Premium for Uninsured Subcontractors

The contractor shall furnish satisfactory evidence that the subcontractor had workers compensation insurance in force covering the work performed for the contractor. For each subcontractor for which such evidence is not furnished, additional premium shall be charged on the policy which insured the contractor as follows:

a. The contractor shall provide a complete payroll record of the employees of each uninsured subcontractor. Premium on such payroll shall be based on the classifications which would have applied if the employees of the subcontractor had been employees of the contractor.

b. If the contractor does not supply the payroll records of its subcontractor, the full subcontract price of the work performed during the policy period by the subcontractor shall be established as the payroll of the subcontractor's employees. The additional premium shall be charged on that amount as payroll.

*Exception* to 3b above

If investigation on a specific job discloses that a definite amount of the subcontract price represents payroll, such amount shall be the payroll for the additional premium computation. In contracts for labor and material, the payroll shall not be less than 50% of the sub-contract price. In contracts for labor only, the payroll shall be established as not less than 90% of the subcontract price.

c. If an experience modification has been established for the contractor, such experience modification shall be applied to the premium developed for the uninsured subcontractor.

NCCI Manual, p. R–21–22, Rule IX(c).

*Conclusions of Law*

█ Initially we will address the defendants' argument that Wausau's acceptance and cashing of the $6,885 check which had on its stub and on the back the words "payment in full settlement" constituted an accord and satisfaction. If defendants are correct in their assertion, the court need not address the merits of the other arguments.

█ Generally, an accord and satisfaction involves a settlement in which one party agrees to pay and the other to receive a different consideration or a sum less than the claimed amount. The "ac-

cord" is the agreement to accept a different consideration in satisfaction of the original obligation. The satisfaction is the delivery of the substituted consideration. *Dyke Industries, Inc. v. Waldrop*, 16 Ark. App. 125, 697 S.W.2d 936 (1985). An accord and satisfaction requires proper subject matter, competent parties, and consideration. *Holland v. Farmers & Merchants Bank*, 18 Ark.App. 119, 711 S.W.2d 481 (1986). Before there can be an accord and satisfaction, there must be a disputed amount involved *and* a consent to accept less than the claimed amount in settlement of the whole. *Dyke Industries, Inc. v. Waldrop*, 16 Ark.App. 125, 697 S.W.2d 936 (1985).

It has been stated that "if the basis upon which a liability should be determined under a contract between the parties is in dispute, the case is governed by the rule that acceptance and collection of a check or other remittance clearly stated to be full payment of the claim, without objection, achieves an accord and satisfaction." *White v. Travelers Indemnity Co.*, 247 Ark. 77, 444 S.W.2d 242 (1969). However, a "check given in payment of a debt does not amount to an extinguishment of the debt unless accepted in absolute payment thereof." *Dudley v. Adams*, 227 Ark. 376, 379, 298 S.W.2d 701 (1957) (quoting *Sharp v. Fleming*, 75 Ark. 556, 88 S.W. 305 (1905)).

The *Dudley* court further noted "acceptance by a creditor of a tender or remittance made by his debtor on a disputed claim does not constitute an accord and satisfaction of the claim, unless clearly indicated by the facts and circumstances to be in full payment thereof. There must be a meeting of the minds of the debtor and creditor before there can be an accord and satisfaction. The debtor must impose the condition of full payment on the disputed claim on the tender or remittance, and the creditor must accept the tender or remittance with such condition attached...." *Dudley*, 227 Ark. at 380, 298 S.W.2d 701.

In this case there was no "meeting of the minds" or objective indicator of agreement within the meaning of the applicable Arkansas case law. *Fort Smith Service Finance Corp. v. Parrish*, 302 Ark. 299, 304, 789 S.W.2d 723 (1990). "The parties must agree that the payment of the smaller sum will discharge the whole debt." *Id. See also Standard Rice Co. v. Landers*, 171 Ark. 517, 284 S.W. 760 (1926). No such agreement is indicated under the particular circumstances involved herein. By affidavit plaintiff states all premium payments are mailed directly to a lockbox at plaintiff's bank. Employees of the bank then endorse and deposit the checks into Wausau's account. Wausau actually receives only a photocopy of the face of the check. The notations regarding full payment appeared on the stub and on the back of the check. The face of the check bore no notation. Thus, there is simply nothing to show that the plaintiff was even aware of the notations. Nor is there any indication that the bank was aware of any dispute concerning the amount of the check. Additionally, Wausau notified Polar of the total balance due on the account. We, therefore, cannot conclude that the acceptance of the check would discharge the whole debt.

■ Next plaintiff argues the per diem allowance paid to drivers is in fact another form of remuneration upon which workers' compensation premiums should be paid. In support of its position the plaintiff has argued that the per mile rates paid by Polar to its drivers are not competitive without the addition of the per diem amounts. Additionally, plaintiff argues that the per diem amounts paid by defendants are not reimbursements for expenses since they are paid automatically without regard to whether or not actual expenses are incurred. Nor according to plaintiff can be the per diem be considered a flat expense allowance because it is a variable which depends upon how hard the driver works or how many miles he drives.

According to the NCCI guidelines, reimbursed expenses and flat expense allowances may be excluded from the audit and, therefore, from the premium basis if 1) the reimbursed expenses or expenses for which allowances were paid were incurred upon

the business of the employer; 2) the amount of each employee's expense payments or allowances is shown separately in the records of the employer; and 3) the amount of each expense reimbursement or allowances payment approximates the actual expenses incurred by the employee in the conduct of his or her work. Defendants' per diem is designed to compensate the drivers for lodging, meals, and other incidental expenses incurred while the driver is performing his duties for defendants, *i.e.* while the driver is on the road. The per diem amounts are separately shown on the defendant's records. Thus, the first two conditions are met.

On the facts of this case, the court believes the third condition is also met. Defendants have provided evidence indicating the per diem allowance is designed to at least partially reimburse the drivers for ordinary and necessary business expenses incurred. The court believes the employer may use information at its disposal to set a figure, whether it is a per mile figure or a flat dollar figure, that is reasonably calculated to approximate expenses incurred or expenses the employer reasonably anticipates will be incurred.

The NCCI guidelines, which the parties both agree govern this issue, do not specify that receipts be required. Nor do the guidelines prohibit a per diem allowance for expenses. Rather it is only required that "each expense reimbursement or allowances payment approximates the actual expenses incurred."

Defendants in setting the per diem figure considered the following: Internal Revenue Service regulations which according to defendants would allow reimbursement of up to $44.00 per day as travel expense reimbursement without requiring the employer to present proof of expenses; the 500 mile per day driving average of the drivers; the estimated three to five nights per week the drivers spend in motels; meal expense estimated at $5.00 to $6.00 per meal; motel expense estimated at $30.00 to $35.00 per day; laundry expense; and the length of time the average driver spent on the road away from home. William Ferguson affidavit. Defendants have also readjusted the per diem allowance when necessary. According to Mr. Ferguson's affidavit the per diem was 3¾ cents per mile in 1985, 4 cents per mile in 1988, and 6 cents per mile from some time in 1988 or 1989 to present.

When all these factors are considered, we believe defendants in setting the per diem amount have attempted to approximate the actual expenses of their drivers within the meaning of the NCCI regulations. Short of requiring actual receipts, the defendants have no method of insuring that the per diem allowance reflect with preciseness the actual expenses of a given driver. Even if a given driver always slept in his sleeper cab, he would still incur expenses for meals and other incidentals. The fact that the per diem is a cents per mile figure rather than a set dollar per day rate does not alter our conclusion. Thus, the per diem allowances are not remuneration and should be excluded from the premium basis pursuant to the relevant NCCI guidelines.

■ Finally, plaintiff argues that the compensation paid to lumpers for loading or unloading the trucks represents a risk to Wausau for which premiums should be paid. In support plaintiff relies on the NCCI Manual provisions dealing with uninsured subcontractors quoted *supra.*

In Arkansas the applicable statutory provision is found at § 11–9–402. Ark.Code Ann. § 11–9–402 (1987). The purpose of these provisions "is to protect the employees of subcontractors who are not financially responsible, and to prevent employers from relieving themselves from liability by doing through independent contractors what they would otherwise do through direct employees." *Liggett Construction Co. v. Griffin,* 4 Ark.App. 247, 251, 629 S.W.2d 316 (1982). Under § 11–9–402 when the subcontractor carries no compensation insurance for its employees the prime contractor becomes the statutory employer. Ark.Code Ann. § 11–9–402(a) (Supp.1991).

The Arkansas statute provides:

**11–9–402. Liability of prime contractors and subcontractor—Sole proprietorships or partnerships**

(a) Where a subcontractor fails to secure compensation required by this chapter, the prime contractor shall be liable for compensation to the employees of the subcontractor.

(b)(1) Any contractor or his insurance carrier who shall become liable for the payment of compensation on account of injury to or death of an employee of his subcontractor may recover from the subcontractor the amount of the compensation paid or for which liability is incurred.

(2) The claim for the recovery shall constitute a lien against any moneys due or to become due to the subcontractor from the prime contractor.

(3) A claim for recovery, however, shall not affect the right of the injured employee or the dependents of the deceased employee to recover compensation due from the prime contractor or his insurance carrier.

(c)(1) When a sole proprietorship or partnership fails to elect to cover the sole proprietor or partners under this chapter, the prime contractor is not liable under this chapter for injuries sustained by the sole proprietor or partners if the sole proprietor or partners are not employees of the prime contractor.

(2) Furthermore, the prime contractor's insurance carrier is not liable for injuries to the sole proprietor or partners described above, and the carrier shall not include compensation paid by the prime contractor to the sole proprietor or partners described above in computing the insurance premium for the prime contractor.

Ark.Code Ann. § 11–9–402 (Supp.1991).

In order to have a subcontractor arrangement, "the person sought to be charged as 'prime contractor' must have been contractually obligated to another for the work being done at the time of the injury." *Bailey v. Simmons,* 6 Ark.App. 193, 195–96, 639 S.W.2d 526 (1982). The loading/unloading services are duties owed by Polar to its customers. The drivers are specifically given this responsibility and may perform the duties themselves or may "farm out" this obligation. *See Bailey v. Simmons,* 6 Ark.App. 193, 639 S.W.2d 526 (1982) (subcontractor v. independent contractor); *Hollingsworth v. Evans,* 255 Ark. 387, 394–5, 500 S.W.2d 382, 385–86 (1973).

Clearly both the NCCI provisions and the Arkansas statutory employer provision envisions the existence of a prime contractor, a subcontractor, and an injured employee of the subcontractor. The provisions are not for the benefit of the subcontractor. Rather the provisions are for the unprotected subcontractor's employees. We do not believe the same person can be both the subcontractor and the injured employee. To so hold would be to ignore both the purpose of the statute and various of the statute's provisions. For instance, the statute specifically provides that the prime contractor or insurance carrier may recover sums it has paid from the subcontractor. Ark.Code Ann. § 11–9–402(b)(1) (Supp. 1991). If the same person could be both the subcontractor and the injured employee, the result of applying § 11–9–402(b)(1) would be that the prime contractor would be required to pay with one hand funds it could recover with the other.

Thus, when the driver hires an individual lumper the plaintiff may not include this compensation in computing the defendants' insurance premium. However, when a loading/unloading service is used the plaintiff may include compensation paid to the service when calculating the premium unless defendants can furnish evidence that the service has compensation insurance.

The parties have agreed that the additional premium calculated by Wausau for compensation paid to lumpers is $18,194.00. Because Wausau in calculating the premiums owed must rely entirely on the defendants' records, we conclude that a presumption exists that entitles Wausau to collect a premium on the total compensation paid to lumpers. This presumption may be rebutted by the defendants showing what portion of the total compensation was paid to a loading/unloading service

rather than an individual working as a lumper.

The policy would then allow defendants to avoid paying premiums on the compensation paid to the loading/unloading services by providing satisfactory proof that these subcontractors had workers' compensation insurance. In this instance we have been advised that the lumpers are paid in cash and no records are maintained regarding the lumpers. Accordingly, as the defendants records are basically non-existent in this regard the presumption is unrebutted and the plaintiff is entitled to judgment in the amount of $18,194.00.